UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| ANNE RAHM § § § § Plaintiff, § v. § § THERMO FISHER SCIENTIFIC, INC., § § § § Defendant. § | CIVIL ACTION NO. H-07-cv-02688 |

MEMORANDUM AND ORDER

Before the Court is Defendant's Motion for Summary Judgment. (Doc. No. 37.) After considering the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that Defendant's Motion should be granted.

I. BACKGROUND

A. Plaintiff's Employment with Thermo Fisher Scientific

Plaintiff Anne Rahm[1] began working for Defendant Fischer Scientific, now Thermo Fisher Scientific, Inc., in May 2000. (Anne Rahm Dep. 22:12, June 17, 2008.) Defendant engages in the supply, marketing, service and manufacturing of scientific, clinical, educational, occupational health, safety products and strategic procurement service. (Marcia Rice Aff. ¶ 3.) Plaintiff's starting position was as a Customer Service Representative, or "CSR." (*Id.* at 22:15.) She was 54 years old at the time she was hired. (*Id.* at 36:17-18.) Defendant's customer service organization in Houston is divided into two divisions: the Research Group and the Healthcare Group. (Courtney Pruitt Aff. ¶ 3.) The Research Group is further broken down into two teams:

---

[1] Plaintiff's date of birth is December 2, 1945. (Rahm Dep. 18:16.)

1

the ACD team and the VAS Team. (Lisa Felan Aff. ¶ 3.) The ACD Team receives calls from all Research Group customers. The vast majority of CSRs are on the ACD Team. A smaller group of CSRs work on the VAS Team, handling calls from designated VAS customers. VAS customers have a specific contractual relationship with Defendant. As a result, VAS CSRs have more regular contact with designated clients than do ACD CSRs. (*Id.*) There are approximately fifty CSRs in both the Research and Healthcare groups. (Rice Aff. ¶ 3.)

The primary duties of the CSRs are to place phone orders from customers, sales representatives, or vendors and to respond to phone or email inquires from these individuals. (Felan Aff. ¶ 3.) A CSR tracks customer shipments, expedites shipments from vendors, handles return of products and inquiries from the purchasing department, and addresses any problems a customer may have with her orders. (*Id.*) To do this job properly, a CSR must be available to be on the phone the vast majority of the time. Plaintiff spent approximately ninety percent of her eight-hour workdays on the phone. (Rahm Dep. 32:2-4.) Avoiding calls is a serious offense for a CSR and grounds for termination. (Rice Aff. ¶ 16.) Defendant's Employee Handbook provides:

> Because of the heavy volume of business-related calls on our telephone systems, you are requested to minimize personal calls. Employees are encouraged to limit personal telephone calls to personal time and to use public telephones. Calls made from certain [c]ompany telephones are subject to being monitored/recorded.
>
> ********
>
> In order to effectively evaluate performance and ensure consistency in the message to existing and prospective customers, random call monitoring/recording will be part of the ongoing performance review process for persons in customer contact departments including but not limited to Customer Service and Telemarketing.

(Nichol Green Aff., Ex. 2 at 23.)

Marcia Rice, manager of the Research Group, approved Plaintiff's hiring as a CSR for the Research Group. (Rice Aff. ¶ 4.)[2] In 2002 or 2003, Plaintiff was transferred to the VAS team with Rice's approval. (*Id.* at ¶ 8.) At the time, Plaintiff was 56 or 57.

In 2004, Plaintiff applied for a position as a supervisor within the VAS team. Rice did not interview Plaintiff for the position. When Plaintiff met with Rice to ask her why she was not interviewed, Rice allegedly informed Plaintiff that she did not fit into Rice's "long-term management plan." (Rahm Dep. 59:9-60:10.) Rice denies making this statement. (Rice Aff. ¶ 33.)

Later, in June 2005, Plaintiff applied to be a Leader in the Healthcare Group. Carolyn Stanley, the manager of the Healthcare Group, asked Rice whether Plaintiff would be suitable for the position. Rice gave Plaintiff a positive recommendation, and Plaintiff received the promotion. (Rice Aff. ¶ 9.) Plaintiff was 59 years old at the time. (Jo Ann Smith Aff. ¶ 16.) Plaintiff received a pay raise as part of the promotion. After a few months, Plaintiff requested to be transferred back to her former position as a CSR on the VAS team. Rice approved Plaintiff's transition back into the VAS team. (*Id.*) As a result, Plaintiff received a pay decrease. Plaintiff sought the demotion because her former VAS supervisor was ill and asked Plaintiff to come back to the group. (Rahm Dep. 121:5-12.)

### B. Plaintiff's Written Warning

Plaintiff alleges that, in September or October 2005, after Plaintiff moved back into the VAS group, she began to feel harassment and increased pressure. (Rahm Dep. 58:6-11.) Plaintiff became concerned that she would lose her job after another CSR, Carol Brahnam, left the company because her work schedule would not allow her to care for her grandchild. (Rahm Dep. 53:7-16.) Plaintiff assumed that the supervisors had refused to change Brahnam's schedule

---

[2] Rice's date of birth is January 21, 1958. (Rice. Aff. ¶ 1.)

3

because of her age and because she had heard Lisa Felan, her VAS team supervisor, comment that Brahnam was "not all there in her mind." (*Id.* at 54:1-55:24; Felan Aff. ¶ 4.)[3]

Plaintiff first complained of age-related harassment to Courtney Pruittt, Director of Customer Service for the Houston office, in August 2006. (Rahm Dep. 58:22-25.)[4] She reported that Felan and Rice were discriminating against her, because Plaintiff had complained to Felan about another CSR, Karee Gonzalez, who was purportedly making sexual comments on her office phone. (Rahm Dep. 73:15-20.) Plaintiff also complained to Pruittt that Felan had unfairly disciplined her after Plaintiff had held up her hand when Felan was attempting to talk to Plaintiff while Plaintiff was on the phone. (*Id.* at 74:16-23.) Plaintiff also informed Pruitt that her work load was becoming unmanageable, which Plaintiff believed was another incident of age discrimination. (Rahm Dep. 75:7-17.) Plaintiff acknowledges that other CSRs experienced increased call volumes during this time period, but she argues that her calls increased at a higher rate. (*Id.* at 75:20-24.)

Felan testifies that she believes Plaintiff was a capable CSR and that her clients liked her and she "usually did a good job." (Felan Aff. ¶ 4.)[5] Felan contends, however, that Plaintiff's interpersonal relations with management, co-workers, vendors, and even some customers were estranged and grew increasingly so over the latter part of her career. (*Id.*) Felan claims that, on numerous occasions, she had to counsel Plaintiff regarding her disruptive behavior and insubordination. According to Felan, Plaintiff was argumentative and would yell at other CSRs

---

[3] Felan's date of birth is August 12, 1970. (Felan Aff. ¶ 1.)
[4] Pruittt's date of birth is May 18, 1972. (Pruittt Aff. ¶ 1.)
[5] Plaintiff contends, in her Response, that she consistently received "meets or exceeds expectations" on annual performance reviews until Felan became her supervisor. In support of this argument, Plaintiff cites to Exhibits 4-6 of her Response, labeled "Performance Appraisals." As Defendant points out in its Motion to Strike (Doc. No. 46), Plaintiff failed to attach the exhibits to her Response; however, Plaintiff's performance appraisals were attached to and authenticated by Jo Anne Smith's Affidavit, attached to Defendant's Motion for Summary Judgment. Smith Aff. ¶ 13, Ex. 14-19.) From 2000-2003, Plaintiff received a score of "achieves expectations." From 2004 to 2005, she received a score of "exceeds expectations"; in 2006, she received a score of "achieves expectations." (*Id.*)

4

and use profanity. Plaintiff contends that she never cursed or used profanity at work. (Rahm Dep. 48:11-18.) In April 2003, Plaintiff was issued a verbal warning when another employee accused Plaintiff of threatening to fight her. (Rice Aff., Ex. 8.) Plaintiff denied the allegation, but signed Defendant's "Verbal Warning" form. (*Id.*) In December 2005, Felan counseled Plaintiff about her inappropriate conduct with another co-worker. (Felan Aff. ¶ 7.) In February 2006, Plaintiff allegedly called a customer an "idiot." (*Id.*) Plaintiff denies calling the customer an idiot. (Rahm Dep. 201:18.) According to Felan, Plaintiff's behavior continued to deteriorate until September 2006. (Felan Aff. ¶ 7.)

As a result, in September 2006, Rice, in consultation with Nichol Green, an employee in human resources, and Pruitt, decided to issue Plaintiff a written warning which described her alleged inappropriate behavior, including recent conflicts with co-workers, her Group Leader, and a customer. (Rice Aff., Ex. 10.) Plaintiff refused to sign the written warning and denied its contents. (*Id.*)

At the time Plaintiff was issued a written warning, Felan, Rice, and Green decided to transfer Plaintiff from the VAS to the ACD team, where she would be supervised by Pam Archer (Felan ¶ 7).[6] According to Defendant, this was done to give Plaintiff "a fresh start" and to resolve the personality conflicts she experienced with the VAS team. (*Id.*) Defendant maintains that the transfer to the ACD team was not a demotion, and that Plaintiff's salary was not reduced in any way because of the transfer. (*Id*; Green Aff. ¶ 6; Archer Aff. ¶ 4.) According to Defendant, CSRs are frequently transferred back and forth between the VAS and ACD teams, depending on staffing needs and personality conflicts. (Felan Aff. ¶ 7; Rice Aff. ¶ 7.)

Plaintiff interprets the transfer as a demotion. Plaintiff contends that VAS is a specialty group because it contains Defendant's most prestigious clients. She also speculates that CSRs

---

[6] Pamela Archer's date of birth is June 2, 1959.

5

receive a pay increase when they move into the VAS group; however, she acknowledges that she did not experience a reduction in pay when she left the VAS group, and that she is not sure whether CSRs experience a pay increase for working in the VAS group or for working certain shifts. (Rahm Dep. 103:2-104:22.) Plaintiff argues that, at the time of her transfer from VAS to ACD, a younger, less-experienced CSR, Kristi Dailey, remained on the VAS team. (Rahm Dep. 113:21-23.)

In November 2006, Plaintiff had dental surgery. About a week after the surgery, when Plaintiff was still recovering, Rice stopped by Plaintiff's desk on her way out of the office. When Plaintiff told Rice that she was still recovering from the surgery, Rice allegedly said that "old people heal more slowly." (Rahm Dep. 159:4-19.) Rice denies making this statement. (Rice Aff. ¶ 33.)

### C.  Plaintiff's Suspension and Termination

In November 2006, Defendant introduced a "Gift Card-a-Day Giveaway" program to encourage CSRs to provide customer service with "excellence, enthusiasm, and professionalism." (Rice. Aff. ¶ 14.) Rice administered the program by randomly monitoring the CSRs and their telephone calls. On November 14, while Rice was monitoring Plaintiff's telephone activity, she observed and documented several instances when Plaintiff appeared to ignore customer calls, prompting customers to hang up without being assisted. (*Id.* at ¶ 15.) In addition, Rice observed Plaintiff calling and listening to her personal voicemail. (*Id.*) Rice listened to Plaintiff on 18 phone calls, beginning at 5:17 p.m., for over one hour. Of these 18 calls, Plaintiff did not respond to a customer's call on eight occasions. Additionally, while Rice was listening, Plaintiff called her personal voicemail on two occasions for approximately five minutes. In Rice's opinion, Plaintiff's activity amounted to call avoidance. (*Id.*)

Rice requested a trace report for Plaintiff's calls from November 7 to November 15, 2006. A trace report shows the phone activity for a CSR for a specific date. (*Id.* at ¶ 18.) The trace report led Rice to believe that Plaintiff was spending an excessive amount of time calling her personal voicemail. (*Id.*) For example, the trace report showed that, on November 14, 2006, Plaintiff called her personal voicemail ten times for a total of 27 minutes. (*Id.* at Ex. 16.)

As part of Rice's investigation, she asked several other supervisors, including Lisa Felan, Diane Green, Tammy Hannah, and Carolyn Stanley to observe and monitor Plaintiff's telephone activity. (Rice Aff. ¶ 19.) Each supervisor monitored Plaintiff's phone activity for a period of time and then sent her observations to Rice. (*Id.* at ¶¶ 20-23.) On November 15, 2006, Stanley monitored Plaintiff's calls. (Stanley Aff. ¶ 5.) While Stanley was listening, Plaintiff called her work voicemail and listened to a total of seventeen saved messages lasting approximately eighteen minutes. (*Id.*) Plaintiff listened to each message in its entirety and all of the message prompts, including "Please make an entry soon or you will be disconnected." Stanley concluded that Plaintiff was engaging in call avoidance. (*Id.*) Felan listened to Plaintiff's calls for about an hour, monitoring eight out of ten calls. (Rice Aff., Ex. 17.) Plaintiff avoided six out of the eight calls, and stayed connected to one call for fourteen minutes, even though the customer had hung up. (*Id.*) Hannah monitored Plaintiff's calls for about fourteen minutes. During this time, Plaintiff called her voicemail twice and did not respond to one other call. (Rice Aff., Ex. 18.) On November 16, Diana Green listened to Plaintiff's calls for over one hour. Green monitored seventeen calls, and Plaintiff avoided four of them. (Rice Aff., Ex. 19.) Rice concluded her investigation of Plaintiff's suspected call avoidance by requesting to have Plaintiff's phone tested on November 16, 2006. (Rice Aff. ¶ 32.) Plaintiff's phone was tested and determined to be working properly. (*Id.*)

Plaintiff explains the accusations of call avoidance. She argues that she had had dental surgery the week before and was trying to clear a backlog. Also, she states that Rice knew she was working in "project code" the night Rice was monitoring her calls. (Rahm Dep. 161:16-25.) She contends that CSRs typically do not have to answer calls when they are working in project code, but that she was trying to help out. (*Id.* at 218:20-219:10.) Further, she attributes the delay in answering calls to the time it took her to put on her headset and press the "in" button to take the call. (*Id.*) Plaintiff also attributes the accusations of call avoidance to the possibility that the system was overloading and dropping calls while she was intermittently answering them. She also states that there were times when she could not hear customers and they could not hear her, and that she was not able to see the visual call notification on her computer screen. (Rahm Dep. 221:1-224:5.) As to the extended period of time Plaintiff spent checking her voicemail, she explains that she had experienced a robbery at her home and that she was waiting to hear if the police had recovered her property. (Rahm Dep. 237:2-10.) Plaintiff believes that the robbery happened on November 14, so she acknowledges that she would not have been checking her voicemail in reference to the robbery until November 15. (Rahm Dep. 44:17-25.)

Defendant fired three other employees for call avoidance in the six months prior to Plaintiff's termination: Christiania Pierce, Rachel Woods, and Brian Christopher. (Pruitt Aff., Ex. 3-5.) All three were under forty when they were terminated. Pierce was 25, Woods was 31, and Christopher was 31. (*Id.*; Green Aff. ¶ 9.) Each was fired after Pruittt monitored their calls. In October 2006, Pruittt listened to Pierce's calls for about forty minutes and heard her avoiding calls. (Pruitt Aff., Ex. 3.) When Pruitt confronted Pierce, Pierce said she believed she was working in a code that would prohibit her from taking a call. Pruitt suspended and then terminated Pierce. (*Id.*) In the same month, Pruitt listened to Woods avoiding calls for part of

8

her shift. After running a trace report, Pruitt similarly suspended and terminated Woods. (Pruitt Aff., Ex. 4.) Earlier, in May 2006, Pruitt terminated Brian Christopher after his trace reports indicated that he had been hanging up on customers for several days. (Pruitt Aff., Ex. 5.)

Defendant's employees admit that there are occasional problems with the phone system that CSRs use. According to Defendant, these problems are very rare, and they affect the entire group of CSRs, not just an individual employee. (Felan ¶ 10.) There are two alert systems that will let a CSR know that a call is on their line. The CSR would see a screen pop up on their computer screen and hear a beep in their ear. (*Id.*) Defendant's employees are not aware of any occasion when both of these systems have not been working at the same time. During the time period when Plaintiff was suspected of avoiding calls, Defendant's employees were not aware of any problems or issues that the CSR Group was having with its phone system. (*Id.*)

After the investigation, Rice requested that Green complete an Involuntary Termination Request Form for Plaintiff. Rice signed the report, and Green signed for Pam Archer, Plaintiff's supervisor, who was away on vacation. (Green Aff. ¶ 11.) Green sent the termination request to Joe Ann Smith, the Director of Human Resources, as well as Plaintiff's 2006 written warning and the documentation of Plaintiff's alleged call avoidance. (*Id.* at ¶ 12.)[7] Smith informed Green that she would review the allegations and instructed Green to suspend Plaintiff pending Smith's decision on the Termination Request. (*Id.*)

On November 17, Rice and Green met with Plaintiff to inform her that she was being suspended pending a decision regarding her discipline for call avoidance. (*Id.* at ¶ 13.) According to Rice and Green, Plaintiff proceeded to engage in a "profanity laced tirade" against them. (*Id.*) Plaintiff allegedly told Rice that she was a bad manager and that nobody on the team liked her. Plaintiff also told Rice that the employees had lost respect for her and that she needed

---

[7] Smith's date of birth is March 5, 1959.

9

to go to church and pray. (*Id.*) Green escorted Plaintiff to her desk to collect her belongings. Plaintiff told Green that she was "no better than the bitch" Rice and that Green knew she was wrong. (*Id.* at ¶ 14.) According to Green, Plaintiff repeatedly told Green to shut her mouth and stop talking to her. She called Green "evil" and "a cold-hearted bitch who would get what was coming to [h]er." Plaintiff also allegedly told Green that she was a horrible HR manager and that she was dragging the company down. (*Id.*) Plaintiff denies cursing at Rice or Green. (Rahm Dep. 155:25-156.)

Green informed Smith of Plaintiff's behavior at this meeting. On November 20, 2006, Smith gave Green permission to terminate Plaintiff. (Green Aff. ¶ 15.) The next day, Green terminated Plaintiff. On November 22, Green sent Plaintiff her Notice of Termination. (*Id.* at 16.) Plaintiff's Termination of Employment stated that the company had "conducted an investigation and [was] able to identify several violations of the Code of Conduct and employee handbook specific to rules and regulations as well as violations of telephone use." (Green Aff., Ex. 17.)

Plaintiff filed suit, alleging that Defendant violated the Texas Commission on Human Rights Act ("TCHRA"), Tex. Lab. Code. § 21.051, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 626, by discriminating against her on the basis of age. Defendant now moves for summary judgment. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## II. ANALYSIS

### A. Summary Judgment

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### B. The Age Discrimination in Employment Act

Under the ADEA, "[i]t shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[8] "A plaintiff can demonstrate age discrimination in through an indirect or inferential [circumstantial] method of proof." *Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 309 (5th Cir. 2004). A plaintiff relying on circumstantial evidence must put forth a prima facie case, at which point the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the employment decision. *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 420 (5th Cir.2006). The

---

[8] TCHRA claims should be evaluated under federal precedent. *See McClaren v. Morrison Mgmt. Specialists, Inc.*, 420 F.3d 457, 461 (5th Cir. 2005.) For the purposes of the Motion for Summary Judgment, Plaintiff asks the Court to treat her TCHRA and ADEA claims as a single cause of action.

11

plaintiff may also show that the defendant's articulated reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic ("mixed motive alternative"). *Rachid*, 376 F.3d at 312. If a plaintiff shows that discrimination was a motivating factor in a mixed-motives case, defendant must then respond with evidence that the same employment decision would have been made regardless of discriminatory motivation. *Rachid*, 376 F.3d at 312 n.8 (citing 42 U.S.C. § 2000e-2(m)).

### C. Plaintiff's Transfer from the VAS to the ACD Team

Plaintiff alleges that her transfer from the VAS to the ACD team constituted a demotion and was thus an adverse employment action.[9] The Fifth Circuit has held, in the context of a Title VII discrimination claim, "to be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if the new position proves objectively worse—such as being less prestigious or less interesting, or providing less room for advancement." *Alvardo v. Texas Rangers*, 492 F.3d 605, 613 (5th Cir. 2007) (internal quotations and citations omitted). Whether the new position is worse is an objective inquiry. *Id.* at 613-614. The plaintiff's subjective perception that a demotion has occurred is not enough. *Id.* (internal quotations and citations omitted). In determining whether the new position is objectively worse, a number of factors may be relevant, including whether the former position: entails an increase in compensation or other tangible benefits; provides greater responsibility or better job duties; provides greater opportunities for career advancement; requires greater skills, education, or experience; is obtained through a complex competitive selection process, or is otherwise objectively more prestigious. *Id.* at 614.

---

[9] Defendant argues that a transfer, without any change in salary or benefits, is not an adverse employment action. In support of its position, Defendant cites *Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002), which was abrogated by *Burlington Northern and Sante Fe Ry Co. v. White*, 548 U.S. 53, 67-68 (2006).

Viewing all facts in the light most favorable to Plaintiff, the Court finds that she has not presented objective evidence that a transfer from the VAS team to the ACD team constitutes a demotion. While Plaintiff asserted in her deposition that the VAS team is a "specialty group" with "the most prestigious clients," she did not provide objective evidence that VAS CSRs are selected through a competitive process, receive specialized training, earn more competitive compensation, or have a better chance of promotion. In *Serena v. City of San Antonio*, 244 F.3d 479, 484-485 (5th Cir. 2001), the Fifth Circuit rejected a police officer's argument that his transfer from the Downtown Foot and Bike Patrol to a regular patrol unit was a demotion. While several officers testified that Foot and Bike Patrol was a "premier department," they admitted that this opinion was a matter of personal preference. The plaintiff failed to show that the transfer affected his pension or chances for promotion, and the City demonstrated that most officers spend a substantial part of their career in regular patrol units. The fact that the plaintiff felt "stigmatized and injured" by the transfer was ultimately insufficient to prove that the transfer was a demotion.

Similarly, in the instant case, Plaintiff's reference to the VAS team as "prestigious" appears to reflect nothing more than her personal preference to be on that team. She does not refute Defendant's evidence that the majority of the CSRs are on the ACD team and that CSRs are regularly transferred between the teams. Unlike the plaintiff in *Serena*, Plaintiff even fails to offer evidence from other CSRs referring to the VAS team as more "prestigious" than the ACD team. Plaintiff's move from the VAS to the ACD team was a lateral transfer and did not constitute an adverse employment action. *See Burger v. Cent. Apartment Mgmt. Inc.*, 168 F.3d 875, 879 (5th Cir. 1999).

### D. Plaintiff's Termination

### 1. Prima Facie Case

As to Plaintiff's termination, Defendant concedes that Plaintiff can establish the first three elements of a prima facie case; however, it contends that her replacement was not significantly younger than she was. Specifically, Defendant argues that Bryan Crow, who temporarily replaced Plaintiff, was 57 years old, "three years younger than Plaintiff." (Def. Mot. at 13; Archer Aff. ¶ 8.) After a brief period of time, Crow left the position to go on disability, and Plaintiff's former responsibilities were allegedly absorbed by the remaining members of the ACD team.

Plaintiff responds by attempting to create a fact issue as to whether it was Crow or Kristi Dailey who replaced Plaintiff after her termination by citing the following exchange from Marcia Rice's deposition:

> Q: When Ms. Rahm left, do you know who assumed that role of working the Stanford account?
> A: The team did.
> Q: Okay. So there wasn't any one person, as Ms. Rahm was that one person who had backup by the team, there was no one person who had the primary responsibility of the account?
> A: She had backup responsibility for that account. Kristi Dailey had backup responsibility for back office functions.
> Q: All right. And in terms of the back office functions, when Ms. Rahm left, do you know who assumed those back office functions for that account?
> A: That would be Kristi Dailey.
> Q: So do you know what Kristi Dailey's age is?
> A: I do not know.

(Marcia Rice Dep.133: 12-17, Oct. 27, 2008.) Defendant, in its Reply, argues that Plaintiff is mischaracterizing the testimony. It alleges that Rice was testifying that Dailey assumed Plaintiff's responsibilities on the VAS team when Plaintiff was transferred from the VAS team to the ACD team in September 2006, not that Dailey assumed Plaintiff's duties upon Plaintiff's termination. (Def. Reply at 3-4.) The Court has reviewed Rice's testimony and, viewing all

14

facts in the light most favorable to Plaintiff, agrees with Defendant that Rice is referring to period of time after Plaintiff was transferred to the ACD team, not her termination. Earlier in the testimony, Rice specifies that Stanford is a VAS customer, which Plaintiff does not dispute. (Rice Dep. 132:10-12.) Additionally, Plaintiff offered no proof of Dailey's age, speculating in her deposition that Dailey is approximately 10 to 13 years younger than she is. (Rahm Dep. 145:24-25, June 17, 2008.) Dailey was actually 51 years old when Plaintiff was terminated. (Smith Aff. ¶ 12.)[10] The Court concludes that, after her termination, Plaintiff was replaced by Crow, not Dailey.

In *O'Connor v. Consolidated Coin Caterers Corporation*, 517 U.S. 308, 311-312 (1996), the Supreme Court held that plaintiffs could establish a prima facie age discrimination claim even if their replacement was also in the protected class.[11] The Supreme Court recognized that its ruling would allow a prima facie case to be created "on the basis of very thin evidence—for example, the replacement of a 68 year old by a 65 year old." *O'Connor*, 517 U.S. at 312. The *O'Connor* court concluded that the "proper solution to the problem lies not in making an utterly irrelevant factor an element of the prima facie case, but rather in recognizing that the prima facie case requires 'evidence adequate to create an inference that an employment decision was based on [a]n [illegal] discriminatory criterion ....'" *Id.* (quoting *Teamsters v. United States*, 431 U.S. 324, 358 (1977)) (alternations in original). "In the age discrimination context, such an inference cannot be drawn from the replacement of a worker with another worker insignificantly younger." *O'Connor*, 517 U.S. at 312. The Fifth Circuit has held that four years is "an insignificant age difference that is not sufficient to support a prima facie case of age discrimination." *Earle v. Aramark Corp.*, 247 Fed.Appx. 519, 523 (5th Cir. 2007) (not designated for publication) (citing

---

[10] Dailey's date of birth is March 21, 1955.
[11] The ADEA protects individuals over the age of forty. 29 U.S.C. § 631(a).

15

*O'Connor*, 517 U.S. at 313; *Grosjean v. First Energy Corp.*, 349 F.3d 332, 338 (6th Cir. 2003) (observing that most circuits have held that an age difference of less than ten years is not significant enough to establish a prima facie case of age discrimination)). The Court therefore concludes that the three-year age difference between Plaintiff and Crow is not significant enough to establish a prima facie case of age discrimination.

Demonstrating that a plaintiff was replaced by someone significantly younger is not the sole means by which a plaintiff may establish the fourth element of a prima facie case. *Williams v. Harris County Hosp. Dist.*, 54 Fed.Appx. 412, at *1, n. 1 (5th Cir. 2002) (not designated for publication). The plaintiff can otherwise show "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *Id.* (citing *Teamsters*, 431 U.S. at 358).Plaintiff argues that such evidence exists in this case. Specifically, Plaintiff argues that, in December 2005, she was disciplined for the confrontation with Kristi Dailey and that Dailey was not similarly reprimanded. A similar incident occurred in August 2006, when Plaintiff complained about Karee Gonzalez, a younger employee. Plaintiff alleges that she was ultimately disciplined and Gonzalez was not. From these two incidents, Plaintiff concludes that these younger employees were treated more favorably. Plaintiff also allegedly heard Felan make age-related derogatory comments about another CSR, Carol Branham.

The Court will first address Plaintiff's assertions regarding Dailey and Gonzalez. Plaintiff cites no evidence indicating that, at the time of her confrontation with Dailey, she received either an oral or written warning that Daly did not similarly receive. Instead, Plaintiff presents an account of the events documented by Lisa Felan describing the December 27, 2005 conflict between Plaintiff and Dailey. (Doc. No. 40, Ex. 28.) Felan says that, after overhearing a confrontation between Plaintiff and Dailey, she brought both women into a conference room and

16

had Plaintiff list each of her concerns about Dailey. Felan then had Dailey respond to each concern. Felan concluded by asking both women to write a statement about the incident, and Carolyn Stanley admonished both Plaintiff and Dailey "that they did not have to like each other but had to be able to work together respectfully and professionally." (*Id.*) When Plaintiff told Felan that she did not want to write the statement, Felan told Plaintiff that she needed to "let go of the fact that Kristi did not like her and she needed to be a professional in the office." (*Id.*)[12] This document indicates that both women received the same punishment for the incident—they were both required to document the events in writing.

As to Plaintiff's August 2006 confrontation with Karee Gonzalez, Plaintiff asserts that she was written up for the incident while Gonzalez was not similarly disciplined. Felan, who mediated the dispute, testified that since she did not witness the confrontation, she placed documentation of the incident in both of the employees' files. (Felan Dep. 140:2-3.) Plaintiff does not offer evidence rebutting Felan's testimony. Rather, she offers her written warning from September 2006, which mentions the incident, but she does not produce her own employee file. Next, she refers the Court to a collection of documents labeled as "Exhibit 17: Employee File for Karee Gonzalez." Defendant responds that it was "not asked to, and thus, did not produce the employee file for Karee Gonzalez." (Def. Reply. At 5, n. 6.) The documents are actually Gonzalez's Personnel Data Sheet and Employee Profile and Change Document (Smith Aff. ¶ 12, Ex. 13). Plaintiff offers no affidavit authenticating the documents as Gonzalez's entire employee file. *See* FED. R. EVD. 901. Unauthenticated documents are not competent summary judgment evidence. *Montes v. Ranson*, 219 Fed.Appx. 378, 380 (5th Cir. 2007) (citing *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *Haynes v. Pennzoil Co.*, 141 F.3d 1163 (5th Cir. 1998)). Because

---

[12] As will be discussed later, this document is not properly authenticated by an affidavit. Because Defendant has not objected to its authenticity, the Court will exercise its discretion not to strike it. *See Eguia v. Tompkins*, 756 F.2d 1130, 1136 (5th Cir. 1985).

Defendant denies producing Gonzalez's file, and because the Court cannot rely on the exhibit's authenticity, or completeness, it will be stricken.

Plaintiff next points to Felan's comment about Carol Branham as other evidence of discrimination. Defendant, while denying that Felan made the comment, argues that, if true, it is merely a stray remark.[13] Statements evince unlawful discrimination only if comments, "'first demonstrate discriminatory animus and, second, are made by a person primarily responsible for the adverse employment action or by a person with influence or leverage over the formal decision maker.'" *Berquist v. Washington Mutual Bank*, 500 F.3d 344, 352 (5th Cir. 2007) (citing *Laxton v. Gap, Inc.*, 333 F.3d 572, 583 (5th Cir. 2003)) (internal quotation omitted). Plaintiff has offered no evidence that Felan, who was not her supervisor at the time Plaintiff was terminated, was primarily responsible for her termination or exercised influence or leverage over those who were. Instead, Felan was Plaintiff's former supervisor, and one of the four employees whom Rice asked to monitor Plaintiff's calls. Rice, as Plaintiff's manager, and Green, as an HR representative, signed Plaintiff's Involuntary Request for Termination, after consulting Pam Archer, Plaintiff's supervisor at the time of termination. Further, Felan's comment was directed at Branham, not Plaintiff, and was made in 2005, at least eleven months before Plaintiff was terminated. (Rahm Dep. 55:1-20.)

Later in Plaintiff's response, she argues that, assuming she has presented a prima facie case, certain incidents warrant the Court's use of the mixed-motive analysis. The Court does not believe that any of these separate incidents creates a prima facie case of age discrimination.

---

[13] Defendant argues that Felan's comment constitutes a "stray remark" and applies the four part test from *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 655-656 (5th Cir. 1996). Following the Supreme Court's decision in *Reeves v. Sanderson Pluming Products, Inc.*, 530 U.S. 133 (2000), the Fifth Circuit has limited its application of the *Brown* test to cases where there is direct evidence of discrimination. *Laxton*, 333 F.3d at 583, n.4. When remarks are presented as additional evidence of discrimination, as in the instant case, the Fifth Circuit inquires whether the statement constitutes discriminatory animus and whether the speaker was primarily responsible for the plaintiff's termination. *See, e.g., Russel v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000); *Berquist*, 500 F.3d at 352.

Plaintiff identifies two comments from Marcia Rice that she believes implicate age discrimination. The first occurred in 2004, when Rice allegedly told Plaintiff that she was not hired for a supervisor's position because she did not fit into Rice's long-term management plan. This comment, which allegedly occurred two years before Plaintiff was terminated, and which made no reference to age, is too vague and remote in time to show discriminatory animus. *Berquist*, 500 F.3d at 351 (holding that supervisor's comment that the company should "attract younger talent," made six months before the plaintiff's termination, was too vague and remote in time to show discriminatory animus).

The second comment was allegedly made shortly before Plaintiff was terminated. Rice allegedly told Plaintiff, who had just had dental surgery, that it takes old people a long time to heal. This broad statement was not, on its face, directed at Plaintiff's job performance, nor did it indicate Rice's preference for younger employees. It contains no discriminatory animus.

Finally, Plaintiff contends that Rice and Felan both knew that Plaintiff's phone was not working, and that Plaintiff was working in "project" code, but that they chose to monitor her phone anyway. Plaintiff refers to an email from Lisa Felan to Brenda Miller, dated August 31, 2006, noting that Plaintiff had complained that she was having trouble hearing customers. (Doc. No. 40, Ex. 21.) Then Plaintiff provides a phone set-up request from Pam Archer to Brenda Miller, dated September 20, 2006. (*Id.* at Ex. 24.) Plaintiff also offers an email from Marcia Rice dated November 16, 2006, asking Brenda Miller to test Plaintiff's phone and to confirm that she is receiving tone signals before Plaintiff began her shift. (*Id.* at 23.) Miller responded to Rice and told her that all the tones were "zipping" into Plaintiff's agent ID. (*Id.*) None of these documents indicates that Felan and Rice knew Plaintiff's phone was malfunctioning at the time she was being monitored for call avoidance. Felan's email is dated from August, three months

19

before Plaintiff was terminated and when Plaintiff was still working on the VAS team. Rice's email exchange with Brown does not mention that Plaintiff had complained about her phone: rather, Rice is merely requesting that Brown confirm that the phone is working.

## III. CONCLUSION

Plaintiff has failed to present a prima facie case. Her replacement was not significantly younger, and she has not presented other evidence suggesting age discrimination. For these reasons, Defendant's Motion for Summary Judgment (Doc. No. 37) is **GRANTED**. Defendant's Motion to Strike (Doc. No. 46) is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the ___11th___ day of May, 2009.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS
ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY
AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN
SENT ONE BY THE COURT.